THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ISIDORE COHEN, Alias IRVING COHEN, Appellant.

Second Department, January 18, 1935.

*I. Henry Kutz* [*Charles Rothaus* with him on the brief], for the appellant.

*Mordecai Konowitz, Assistant District Attorney* [*Charles S. Colden, District Attorney*, with him on the brief], for the respondent.

DAVIS, J.   The defendant was indicted on March 28, 1932, for violation of section 1897 of the Penal Law, in that on the 15th day of January, 1932, he did unlawfully have in his possession a firearm of a size which may be concealed upon the person, to wit, a thirty-two calibre revolver.   To this indictment he pleaded not guilty, and trial was had in County Court.

On the first trial the defendant was convicted and sentenced to the New York Penitentiary, to be discharged subject to the rules of that institution.   That conviction was reversed by this court and a new trial ordered (241 App. Div. 607).

On the second trial, now under review, he was again convicted on practically the same state of facts, and was sentenced to be imprisoned at Sing Sing, where he is now confined, for a term of not less than three years and six months or not more than seven years.   There is no explanation of this much greater severity of sentence.

What was said briefly on reversal of the first judgment in this case and on the reversal of the judgment of conviction of one Sachs in the appeal in his case, argued at the same time (241 App. Div. 608), may now be repeated with more extended discussion and with greater emphasis.   There was only the outward semblance of fairness on this second trial.   The presiding judge from time to time assumed the role of prosecutor and made frequent comments of a disparaging and prejudicial character as to the evidence that was being brought out in respect to beatings and otherwise, plainly conveying to the jury his disbelief.   The atmosphere of the trial was such that the defendant had no fair chance of having his case considered by the jury on the merits.   The trial judge submitted the question as to the so-called " voluntary confession " to the jury in a most casual way, with inadequate instructions regarding the

beatings, when evidently he would have been justified in deciding that the alleged confession was not admissible as a matter of law. In submitting to the jury the question as to whether an alleged confession is voluntary or whether defendant has been deprived of his legal rights in delaying his arraignment before a magistrate, it is not sufficient to make formal reference to the law and to the evidence with a statement of legal definitions; but the trial judge should present for the consideration of the jury the concrete questions which the trial has developed, with proper instructions relating to the evidence as to how the jury should go about considering and determining vital issues. (*People* v. *Odell*, 230 N. Y. 481; *People* v. *Sobieskoda*, 235 id. 411, 420; *People* v. *Montesanto*, 236 id. 396, 405–407; *Kreiner* v. *United States*, 11 F. [2d] 722, 731.)

It appears without dispute (although the story of the defendant and his associates might readily have been contradicted if false) that defendant was about thirty years of age, married, and a painter by trade who worked at that occupation and at any other when he could find employment; that at least one of his companions was steadily employed and the others were employed irregularly. On the morning of January 15, 1932, the four men drove in an automobile from Brooklyn to New York to seek jobs for those who were unemployed, from a bus company which they had been informed was seeking drivers. Their quest for work was unsuccessful, so on their return they chose a different route by going over the Queensboro bridge. The territory in the borough of Queens was unfamiliar to them and they became confused as to the proper streets to take to continue their journey home. They stopped and made inquiry about ten A. M., and, as they were driving about in an effort to reach their homes, they were apprehended by police officers who became suspicious of their movements. There is not the slightest evidence that they had any ulterior purpose while thus driving about; but, of course, having apprehended them, it was essential for the police to find some grounds to justify an unwarranted arrest. The justification was found, so it was claimed, by the discovery of a revolver in the automobile. They were taken to the police station at the One Hundred and Twelfth precinct and there a further search of the automobile is claimed to have resulted in the discovery of two other revolvers. The defendants denied that these revolvers were theirs or that they had ever seen them before the police took or pretended to take them from the automobile. It is admitted that no firearms were found on the person of any of these men.

They were then taken to the One Hundred and Eighth precinct, known also as the Sixteenth detective district, and, as the defendant claims, without dispute, they were kept there from that time until

the following morning at eight o'clock, when they were taken to the " line-up." They were not arraigned in the Magistrate's Court until ten o'clock or later on the day following their arrest. They were then committed to the city prison pending examination before the magistrate. They were given no food during the twenty-four hours that they were in custody.

The defendant testified that during the period from about noon following their arrest until they were all locked up in the detention cells about midnight or later, he was cruelly beaten by the police at intervals for the purpose of extracting a confession. This evidence is in part corroborated by Sachs. The police officers testified that the defendant admitted " voluntarily " that one of the revolvers was his; and that this admission was repeated the following morning during the interrogation at the " line-up." The defendant denied that he made any such confession; and, as I have said, denied that he ever saw or possessed the revolver in question. There is no evidence to the contrary, except the alleged confession.

The trial judge excluded — improperly, as we believe — the testimony of Sachs concerning what happened to him and the others as they were taken separately into the office of the police captain. The men were all arrested at the same time and subjected to the same sort of treatment as one common transaction; and whatever was done in the matter of compelling a confession by use of violence was admissible.

There was, as I have said, some corroboration as to the treatment accorded the defendant Cohen by one of his associates as to what he saw and heard. It is unnecessary to give the details of these beatings, but they may be characterized as acts of sheer brutality. Convincing corroboration by circumstances was given of this cruel application of violence, as will presently be stated.

There was, of course, formal denial by the different police officers that any beating occurred. Their testimony is unworthy of belief in view of the fact that it is admitted by them that the defendant was without any visible marks on his head and face when apprehended, although one of the officers contented himself with repeating, " I don't recall any marks." When Cohen was taken to the city prison he called for the warden, who summoned a physician from a nearby hospital. This physician examined him and found ribs fractured, one of his eyes closed, one of his ears injured and swollen, contusions on his head, teeth knocked out and mouth bleeding, a possible fracture of his left hand or wrist and his body a mass of bruises. Defendant was taken to the correction hospital shortly thereafter by the warden and similar conditions were disclosed in an examination by the physician in charge. Defendant

remained in the hospital for treatment of his injuries for five days before he was discharged and returned to the prison. Concerning these obvious marks of assault and violence there is no explanation whatever by the police, except as to their denial of being the cause, or by the district attorney on the argument here. As the defendant was in the custody of the police during all this time, there can be no other conclusion than that he was beaten by them or by some of them with the knowledge of the superior officers in charge during the time that he was detained by them.

A confession obtained by such means has no legal effect. (*People* v. *Weiner*, 248 N. Y. 118; *People* v. *Barbato*, 254 id. 170; *People* v. *Mummiani*, 258 id. 394, op. by LEHMAN, J.)

There was some evidence also that one or more of the persons arrested at the same time bore similar marks and were taken to the hospital for treatment after they had reached the city prison.

Whatever justification there may be generally in the public mind for such harsh treatment in the case of desperate men and confirmed criminals, there is, of course, no legal justification to be found in this case, nor as a matter of policy appealing to laymen who are ready to put an end to the domination of criminals by any means available, whether strictly legal or otherwise. Ordinary people traveling the streets should not be exposed to the risk of such crude, unintelligent action on the part of the police. That similar mistakes have been made before is well known to the police and by the public generally. This defendant had no criminal record in respect to robbery or other crimes of violence. It appears that he had once been convicted of assault in the third degree under circumstances not shown and the punishment of which is not disclosed; and once for illegal registration for which he received a sentence of thirty days. The other men who were his companions apparently had no criminal records and were, so far as this record shows, decent, law-abiding citizens with families; and, as I have said, one or more of them were engaged in steady employment.

The defendant was entitled to be taken before a magistrate and arraigned without unnecessary delay. (Code Crim. Proc. § 165.) As he was arrested about ten A. M., there was plenty of opportunity to arraign him during the day. That he was not arraigned was for the evident purpose of obtaining a confession by the use of violence. The excuses made for the delay — that holdup victims were called in to see if they could identify him — were of the flimsiest character. None did, for the very good reason, apparently, that he had never been engaged in any such crime. It seems to have been a somewhat common practice in Queens county not to comply with the provisions of law cited. (See *People* v. *Alex*, 260 N. Y. 425; S. C.,

265 id. 192.) The police officers were guilty of oppression and neglect in violating the plain provisions of the law in that respect, constituting of itself a crime. (*People* v. *Mummiani, supra,* 399, 400.) The fact that he was not arraigned should have been called to the attention of the jury as bearing upon the question of the treatment to which he was subjected during the interval between his arrest and arraignment. (*People* v. *Alex,* 265 N. Y. 192.)

We think there may be a bare question of fact as to the admissibility of the confession, and, therefore, with considerable reluctance, grant a new trial. If a new trial is had, the district attorney should move the trial before another judge. He would be amply justified in moving for a dismissal of the indictment.

The judgment of conviction should be reversed on the law and the facts and a new trial ordered.

YOUNG, SCUDDER and TOMPKINS, JJ., concur; LAZANSKY, P. J., concurs in result.

Judgment of conviction of the County Court of Queens county reversed on the law and the facts and a new trial ordered.